## COOK PAINT & VARNISH CO. v. COOK CHEMICAL CO.

### No. 4911

United States District Court
W. D. Missouri, W. D.

Aug. 8, 1949.

See also 8 F.R.D. 93.

Scott R. Timmons, Robert S. Eastin and Robert B. Caldwell (of Caldwell, Downing, Noble & Garrity), Kansas City, Mo., for plaintiff.

Gordon D. Schmidt, C. Earl Hovey, and Reed O. Gentry, Kansas City, Mo., Jack B. Robertson, St. Joseph, Mo., and Clay C. Rogers (of Mosman, Rogers, Bell, Field & Gentry), Kansas City, Mo., for defendant.

REEVES, Chief Judge.

There is no substantial controversy either upon the facts or the law of this case. Counsel on both sides with great and commendable diligence and industry have collated a vast body of the law on the synonymous subjects of Unfair Competition, Unfair Trade Practices and Infringement of Trade-Names. The task of the court is to select and apply from able briefs applicable doctrines to the facts of the case. The only

---

[6] No opinion for publication.

issue for decision is whether, upon the undisputed facts, the defendant has been guilty of unfair trade practices by infringing the trade-name of the plaintiff, if it had in fact acquired a trade-name.

A predecessor of the plaintiff began business in the year 1913 under the corporate name of C. R. Cook Paint Company. In 1919 a new corporation was formed which took over the business of the first corporation. The second corporation was formed under the laws of Missouri; and, then, in 1927, a Delaware corporation was formed (the plaintiff in this case) and it took over, as had its predecessor, the good-will, trademarks, etc., of its several predecessors. Throughout the existence of the plaintiff corporation or its predecessors, it has been and was engaged in the "manufacture and sale of paints, varnishes, lacquers, enamels, waxes, cleaners, polishes, floor finishes and cleaners, waterproofing compounds, soaps, linoleum finishes, thinners, synthetic resins and other related items."

In addition to the above, it distributes other products not manufactured by it. The plaintiff and its predecessors experienced a tremendous annual growth from a few hundred thousand dollars at the beginning to many millions of dollars at the time this case was tried. In fact, in 1947, its business aggregated 27 million dollars. In like manner, its advertising expense had increased from year to year until, at the time the case was tried, it approached a million dollars for one year. It has employed practically every known advertising media, such as newspapers, radio, bill boards, road signs, direct mail, etc. Its trade area includes many states, and it has several factories distributed over its trade area. It has many distributing warehouses and a large number of retail stores. It sells its product, as well as other products handled by it, to thousands of retail dealers, including many large customers.

In its advertisements it has continuously from its beginning emphasized the name "Cook,", "Cook's", and "Cook's Paints", etc. The names thus used have become identified extensively throughout its entire trade area with the above-mentioned products. Such advertising has continued from the beginning in 1913 to the present time.

The defendant (engaged in manufacturing and selling insecticides) early in the year 1946, after its incorporation in 1944, began advertising its products as "Cook-Kill", "Cook's Cert-O-Cide", "Cook's Weed Killer", etc. Defendant's income from sales ran also into large figures and its advertising expense was heavy. Prior to the employment of the name "Cook" in its advertising the defendant referred to or characterized its products as "Triple-C DDT Products," "Triple-C DDT Wonder Spray," "Triple-C DDT Wonder Powder", etc., and issued literature, such as "Free Booklet!" "How To Use Triple-C D.D.T."

A partnership was formed among Oscar T. Cook and others in the year 1941. This was followed by incorporating the defendant in 1944. Oscar T. Cook had been engaged for many years, in fact since 1904, in the business of fumigating grains, and used, for such purpose, insecticide chemicals. His operations extended over a large territory. In fact, as he testified, he used fumigants all over the United States. His activities, however, were limited to grain until DDT was compounded and then he became a distributor for this well-known insecticide. All of his advertising in relation to DDT, and all the publicity in the use of DDT came largely from the army. When the war was over DDT was very popular. During that time Mr. Cook used his grain trade acquaintance and connections for the distribution of DDT. The government released the DDT formula in 1945, and it was then that Mr. Cook became an independent distributor of DDT and, as heretofore indicated, began to advertise for himself. Such advertisement was in the manner above set out. Under an arrangement with the Commodity Credit Corporation he advertised this product under the name of "Triple-C DDT." Although the defendant was incorporated in 1944, it did not change the advertising methods until early in the year 1946. The name of "Cook" was not identified with the product known as DDT advertised by him as "Triple-C DDT." Early in 1946 the defendant procured the services of the ad-

vertising agency then serving the plaintiff. Immediately its advertising methods were changed and the name "Cook" became a conspicuous part in all its advertising media, such as "Cook-Kill", "Cook's Cert-O-Cide", "Cook's Wonder Weed Killer." Its sales immensely increased and its business in a large measure coincided with the area or trade territory covered by the plaintiff.

It is acknowledged by the parties that the two litigants were not competitors in so far as their products were concerned. The plaintiff manufactured and sold paints, varnishes, etc., and distributed certain household needs, whereas the defendant confined its activities to insecticides. The only question, therefore, is whether, in these operations, the plaintiff had acquired a property right in its trade-name, and, whether, if so, the defendant had infringed this right.

 1. Since this is an alleged infringement of a trade-name, the law of Missouri will apply. The doctrine of trade-marks will be applicable. In Skinner v. Oakes, 10 Mo.App. 45, loc. cit. 56, it is there stated that: "A trade-mark may, and often does, consist in the name of a person or partnership firm; and the exclusive use of such trade-mark is upheld, with this limitation, that another person of the same name is not to be prevented from using his name in the same way, *provided there are no special circumstances which makes it inequitable for him to do so."* (Emphasis mine.)

And, similarly, in Lo Buono v. V. Viviano & Bros. Macaroni Mfg. Co., 197 Mo. App. 618, loc. cit. 626, 198 S.W. 498, loc. cit. 500, where the court said: "It may be conceded that the general rule is that a personal name—an ordinary family surname—cannot be exclusively appropriated by any one as against others having a right to use it. The rule proceeds upon the broad principle that every man has a right to use his name reasonably and honestly in any business calling."

The court then cited with approval the very well-known case of Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, loc. cit. 187, 16 S.Ct. 1002, loc. cit. 1009, 41 L.Ed. 118,

where the Supreme Court appended this qualification: " 'But although he may thus use his name he cannot resort to any artifice, or do any act calculated to mislead the public as to the identity of the business firm or establishment, or of the article produced by them, and thus produce injury to the other beyond that which results from the similarity of name.' "

 2. With the above serving as a postulate, the next proper inquiry is whether the plaintiff, by its long use of the name "Cook", "Cook's Paint", etc., has acquired rights usually appertaining to trade-names. This cannot be gainsaid. According to the uncontradicted evidence, plaintiff's product has been closely identified with the name "Cook" and "Cook's Paint" for more than thirty years. Upon using such names, or seeing them, therefore, the public would at once think of the plaintiff's products, such as paints, varnishes, lacquers, etc. This would naturally follow. The defendant, as a corporation, had acquired no right from Oscar T. Cook in his personal business activities, or in his former firm connections, to use the name "Cook" in its advertising and its business activities.

The evidence is overwhelming that Oscar T. Cook, in his personal capacity, never acquired a trade right in the name "Cook." The same thing is true in respect of his firm connections. Moreover, the defendant never began using the trade-name employed by it until early in the year 1946. The corporate defendant, therefore, is not the logical successor of any individual who had undertaken to use, and was clothed with the right to use his personal name for trade purposes. All of the authorities are one way relating to the subject of similarity of names and need not be cited.

3. However, even if the defendant had acquired the right in the trade-name employed by it (which it has not) yet the question remains, whether it has abused that right and in so doing injured the plaintiff by trespass upon its trade-name in the manner in which it has advertised its business. That its method of advertising and the use of the name of "Cook's," "Cook-Kill", "Cook's Weed Killer" and "Cook's Cert-O-Cide" has caused confusion

cannot be denied. Such was the evidence. The confusion was not great, and the plaintiff was only vexed by such confusion in a small percentage of its transactions; but, nevertheless, there was confusion. The defendant, in 1946, abandoned its trade-names and through its advertising agency (also serving plaintiff) began to use trade-names similar to those of plaintiff. Even though no fraud was intended, yet plaintiff is entitled to an injunction. Stork Restaurant, Inc. v. Sahati et al., 9 Cir., 166 F.2d 348.

Furthermore, the defendant was familiar with the long and extensive use of plaintiff's trade-name. and the advantages that undoubtedly would accrue to it because of the good will attaching to said name.

It follows that an injunction should be granted to restrain the further infringement of plaintiff's trade-name. Counsel for plaintiff will prepare and submit an appropriate decree.